IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville September 15, 2015

## STATE OF TENNESSEE v. ANTONIO L. NELSON

**Direct Appeal from the Circuit Court for Cheatham County**
**No. 2014-CR-17143      Larry J. Wallace, Judge**

---

**No. M2014-02526-CCA-R3-CD – Filed May 9, 2016**

---

The Appellant, Antonio L. Nelson, pled nolo contendere in the Cheatham County Circuit Court to aggravated burglary, aggravated robbery, aggravated rape, and two counts of theft of property valued over $1,000 but less than $10,000.  The trial court sentenced the Appellant to a total effective sentence of forty years.  On appeal, the Appellant challenges the length of the individual sentences imposed by the trial court and the trial court's imposition of consecutive sentencing.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Manuel B. Russ, Nashville, Tennessee (on appeal), and Jack Arnold, Ashland City, Tennessee (at trial), for the Appellant, Antonio L. Nelson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and Robert S. Wilson and Margaret Sagi, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On February 3, 2014, the Appellant and his co-defendant, Kerry V. Covington, were charged by presentment with the aggravated robbery of A.S.,[1] a Class B felony; two counts of the aggravated kidnapping of A.S., Class B felonies; the aggravated rape of A.S., a Class A felony; the aggravated burglary of Nicole E. Greene, a Class C felony; the theft of property valued over $1,000 but less than $10,000 from Nicole E. Greene, a Class D felony; and the theft of property valued over $1,000 but less than $10,000 from Jared and Misty Dempsey, a Class D felony. On June 16, 2014, the Appellant pled nolo contendere to aggravated burglary, aggravated robbery, aggravated rape, and both theft offenses. The aggravated kidnapping charges were dismissed by the State. The trial court's order accepting the plea stated that the trial court would determine the length and manner of service of the Appellant's sentences.

In the sentencing hearing, Lyndelle McCullough testified that she was the probation officer who prepared the Appellant's presentence report. The report contained the following, which was the Appellant's version of events:[2]

> "I feel if I was not high I would have never went thru with this robbery. When it happen I wanted to leave but things got to running thru my head like what if he try and do something to me for leaving. I felt very bad for the lady. I counldnt bare myself to set and watch the pain he was putting her thru.
>
> So thats why I decided to go thru the house and take things. I never should have started hanging with Kerry since he first got out of jail. He was trouble when I first met him. But I had no where to live at the time and he's goin let me stay with them. So he was always around. When he asked me to go robbing with him I was . . . . okay but we was never suppose to end up here in Cheatham County. If I wasnt so high to the point I feel a sleep I wouldnt have came to Ashland City from the begining. I feel bad for the people involved in the robbery the house I was in, the car we took. Im so sorry for all the pain we have caused these people.
>
> I just hope they find in their hearts forgivness. I am not the person everybody trying to make me to be. I have a heart and I'm not a mean person. This has really opened my eyes on whos my friends and changed me to change my life

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials.

[2] The Appellant's version of events is set out verbatim as transcribed in the presentence report.

for the best. Once again Im sorry for everthing that has happen and I hope one day they will except my apologees and see Im not who their think I am."

Ms. McCullough testified that the Appellant was twenty-six years old at the time of the sentencing hearing. The Appellant's presentence report reflects that he had prior convictions of domestic violence, facilitation of casual exchange, misdemeanor theft, use of stolen license plates, possession with intent to go armed, reckless driving, and attempted "felony counterfeit control[led] subs[tance]." Ms. McCullough said that the Appellant was on probation for domestic violence, a Class A misdemeanor, at the time the instant offenses were committed.

Ms. McCullough said that the Appellant attended school until the twelfth grade but did not graduate. The Appellant admitted having a history of drug and alcohol abuse, reporting that he had used "Molly," "barz," "tabs," "x-pills," and cocaine. The Appellant said that he had three minor children. He owed $2,000 in child support and $22,000 in court fines.

Ashland City Detective Johnny Hunter testified that he began investigating the offenses by going to Alta Loma Drive where a home invasion had taken place. He learned that the Appellant and Mr. Covington entered Ms. Greene's house through an unlocked back window. Detective Hunter spoke with A.S. at a neighbor's house as she was waiting on an ambulance to transport her to the hospital. A.S. said that the Dempseys were at her house for dinner when she realized she needed an onion. A.S. called Ms. Greene and asked to borrow an onion. Ms. Greene was not at home, so she gave A.S. the code to the key pad on the back door so A.S. could get inside the house. A.S. drove the Dempseys' Jeep to Ms. Greene's house. When A.S. went into Ms. Greene's kitchen, she was attacked from behind, knocked to the floor, and carried to a bedroom. The men "tied her up [with electrical cords], put her face down on the bed, pulled her pants down and inserted a screwdriver in her anus and beat her up quite bad." Additionally, "they pulled a great deal of her hair right out of her head. She almost had a bald spot where they jerked her around." During the attack, the men threatened her, cursed her, told her to be quiet, "smacked" her, and "beat her quite bad." The men took A.S. to the bathroom and threw her, still bound and partially undressed, into the bathtub "like a basketball." The men left the house, took Ms. Dempsey's purse from the Jeep, and returned to the house. They dumped the purse on the floor and found Ms. Dempsey's debit card. Mr. Covington went into the bathroom with a gun, pointed it at A.S.'s head, and told her to give him the personal identification number (PIN) for Ms. Dempsey's debit card. He threatened to kill her if she lied about the PIN. A.S. gave him the PIN for her debit card. The perpetrators went through the house and took televisions, jewelry, a shotgun, and other items. They also took A.S.'s wedding rings, which were valued over $1,000.

A.S. told Detective Hunter that after the men left, she got out of the bathtub and went across the street to a neighbor's house. While she was crossing the street, she saw the men in the Dempseys' Jeep approximately 300 feet down the street. Mr. Covington got out of the Jeep, got into a blue car driven by his girlfriend, who was later identified as Latrae Stevenson, and the trio left the area.

Detective Hunter learned that the Appellant left the scene of the crimes and went to a Bank of America. One of the bank's security videos showed the Appellant wearing a right-hand work glove with the word "King" written across the knuckles. The Appellant tried to use Ms. Dempsey's debit card at the automatic teller machine (ATM) but left when the PIN did not work. The Appellant then drove to a nearby Kwik Sak and attempted to use Ms. Dempsey's debit card to buy cigarettes. Detective Hunter said that when the Appellant was apprehended by the police, he said that he had pawned A.S.'s wedding rings. The police recovered the rings from a pawn shop near the Kwik Sak.

Detective Hunter said that the night after the offenses, the Metropolitan Nashville Police Department performed a "knock and talk" at an apartment in the Dellway Villa complex. During a consensual search, they found Ms. Greene's stolen shotgun. The Appellant was in the apartment at the time of the search, but Mr. Covington was not there.

On cross-examination, Detective Hunter recalled that A.S. described Mr. Covington as "the dark-colored individual with the green coat with a hoodie on it." She said that he held her face-down on the bed. A.S. was not sure which man assaulted her with the screwdriver. Detective Hunter did not know who owned the apartment in which the gun was found.

On redirect examination, Detective Hunter said that the Appellant had a lighter complexion than Mr. Covington.

In response to the trial court's questioning, Detective Hunter said that during the attack, one man stayed with A.S. while the other went through the house, took items, and put them in the car. The men threatened to take her with them. A.S. told Detective Hunter that she feared they would kill her if they took her with them. Eventually, they threw her in the bathtub and left the house. Detective Hunter said that the gun the perpetrators pointed at A.S. was the shotgun they took from a closet in Ms. Greene's house.

On recross-examination, Detective Hunter stated that he thought only one man went into the bathroom with the shotgun.

A.S. testified that on the night of the offenses, she went into Ms. Greene's house and walked toward the "onion rack." The Appellant and Mr. Covington approached her from behind, "tackled" her, and knocked her to the floor. She tried to fight back, but they threatened to kill her and told her not to do "anything stupid." The men "punched" her and made her stand up. A.S. first said that Mr. Covington held her in a "headlock," and the Appellant said, "'check her pockets.'" She then said it happened "the other way around." They demanded that she tell them where the money and jewelry were. She told them that she did not live in that house. One of the men held a screwdriver to her throat. A.S. said that the men jerked her up by her hair, dragged her to the front door, and had her turn the dead bolt lock. She said that she had "a hole where they pulled [her] hair out."

A.S. said that as the men took her into the bedroom, the Appellant repeatedly told Mr. Covington to tie up A.S. She begged them not to hurt her and told them that she had children. Upon reaching the bedroom, they threw her face-down on the bed and put a pillow over her head. Mr. Covington remained in the bedroom while the Appellant "ransack[ed]" the house, looking for items to steal and for something to use to tie up A.S. A.S. said that the long black wool coat she was wearing bunched up around her head, and she found it difficult to breathe. Mr. Covington put his hands around her neck and threatened to kill her if she did not calm down.

A.S. said that when the Appellant returned to the bedroom, her pants and underwear were pulled down and her boots were removed. Someone inserted the screwdriver into her anus, causing a tear. She explained that Mr. Covington was holding her with his hands; therefore, she thought the Appellant was the person who penetrated her with the screwdriver.

Afterward, the men tied her ankles, flipped her over, and tied her wrists in front of her. They carried her to the bathroom and threw her into the bathtub "like a basketball." The Appellant left the bathroom and returned with a shotgun, which he gave to Mr. Covington. The Appellant then left the room. Mr. Covington then pointed the gun at A.S.'s head and threatened to kill her. Mr. Covington left the bathroom for a few seconds, and when he returned, he asked for the PIN for the debit card. They told her that they intended to take her with them and threatened to kill her if she gave them the wrong PIN.

A.S. said that she heard the door shut and thought the men had left. Although she was still tied up, she managed to get out of the bathtub, leave the house, and "hop across the street to Mr. Gay's house." She hit the neighbor's door with her elbow or knee, and the Gays opened the door. Mr. Gay untied her, and Ms. Gay called 911.

A.S. said that she was "bruised and beaten, physically and emotionally." Prior to the crimes, she was a happy and independent person who felt safe at home. Afterward, she was "terrified to go home, yet terrified to leave home." A.S. said that she could not eat and had trouble sleeping. She said that she would never be able to forget what happened and that she had scars on her ankles that "serve[d] as a constant reminder."

A.S. said that the men knew where she lived and threatened to kill her and her children. She found it difficult to explain to her six-year-old daughter why she was wounded, upset, and scared and why they had moved in with A.S.'s parents. However, someone at school told her daughter that two men had tied up A.S. and beat her. A.S. was "crushed" that her child's feeling of security had been taken from her.

A.S. said that in order to feel safer, she got a gun for protection and had an alarm system installed in her house, but she still feared being home alone. She tried to "pull [her]self together" and "look strong" for her daughter. A.S. said that she was thankful her children were not with her on the night of the offenses because "[i]t haunt[ed her] to think what those monsters would have done to them."

Defense counsel asked no questions of A.S. The trial court asked if both men carried her into the bathroom, and A.S. said that she could not remember if they both did or only Mr. Covington. A.S. said that both men threatened to kill her and told her "they would put the screwdriver in the back of [her] neck."

A.S. said that the Appellant "very much so seemed like the ring leader" because he told Mr. Covington what to do. She said that both men threatened to kill her children and that the Appellant "actually said that [they] love to kill kids."

On redirect examination, A.S. said that when she was on the bed, the men removed her wedding rings from her finger. They were wearing blue medical gloves.

On cross-examination, A.S. said that Mr. Covington was the man in the green hoodie.

The Appellant's father, Bruce Nelson, testified that the Appellant was "a pretty good dude" and was always willing to help other people. In 1993, when the Appellant was five or six years old, his thirteen-month-old sister passed away. The Appellant blamed himself for his sister's death because she died as the result of swallowing one of his pennies. Approximately one year later, the Appellant's mother died from a heart attack. The Appellant began having problems in school and had "attitude problems." He had psychiatric treatment and was prescribed Ritalin and an anti-depressant.

Mr. Nelson said that he knew the Appellant had a problem with drugs and alcohol, but that he did not know it was "this serious." Mr. Nelson did not know the Appellant was taking "Mollies," which Mr. Nelson said was "a real bad drug."

Mr. Nelson said that the Appellant used to bring his daughter and his two stepchildren, to whom he was "a father figure," to visit Mr. Nelson.

On cross-examination, Mr. Nelson said that the Appellant was twenty-six years old and had not lived with him since the Appellant was in high school. Mr. Nelson was aware that the Appellant got into trouble for driving without a license after leaving Mr. Nelson's home. Mr. Nelson said that he was "[s]omewhat" aware of the Appellant's conviction of domestic violence.

Latoya Wells testified that she and the Appellant were not married, but they had been in a relationship "off-and-on" for eight years. They had a four-year-old child, and Ms. Wells had two older daughters. Only one of her children was the Appellant's, but the other two children called him "dad." When the Appellant was working, he supported all of her children financially and helped to take care of them. Ms. Wells said that the Appellant's most recent employment was with Goodwill and that he lost that job in July or August 2013. She said that the Appellant was handy and did side jobs to make money.

Ms. Wells stated that she had never met Mr. Covington and that she did not know when the Appellant and Mr. Covington started "associating."

Ms. Wells said that the Appellant used drugs and alcohol to cope with the deaths of his mother and sister. She said that when the Appellant was hurt or stressed, he drank alcohol or smoked marijuana. She knew he occasionally used "Molly," but she did not know he used cocaine.

On cross-examination, Ms. Wells acknowledged that she was the victim in the Appellant's domestic assault conviction. She said that she knew the Appellant occasionally used "Molly, Lortabs and Xanaxes."

Nathan Frey, the Appellant's grandfather, testified that he had seen the Appellant only "sporadically" since the Appellant was seventeen or eighteen years old. Mr. Frey said that early in the Appellant's life, he spent a lot of time with his grandparents. The Appellant helped Mr. Frey, who was a pastor, at different churches around the Middle Tennessee area. He described the Appellant as "a good-hearted kid."

Mr. Frey said that in 1992 or 1993, the Appellant's baby sister swallowed some change the Appellant had at his bedside and died as a result. The Appellant blamed himself for her death. Mr. Frey tried to counsel the Appellant to let him know his sister's

death was not his fault. However, the Appellant's attitude changed, and his "joy and . . . happiness" seemed to be gone.

Mr. Frey said that the Appellant's mother "grieved tremendously" for her daughter and died four or five years later. The Appellant was close to his mother and took her death "tremendously hard." The Appellant began having problems in school, and his friends began "leading him into things." Mr. Frey thought that the Appellant was seeking "acceptance" and "relief."

Mr. Frey said that recently, the Appellant came to visit. Mr. Frey later learned that Mr. Covington frequently visited the Freys' neighbor, who may have been Mr. Covington's second cousin, and that the Appellant had been going to the neighbor's house in the "last three months or so before this incident." Mr. Frey said that Mr. Covington was "disrupti[ve]," played loud music late at night, and cursed a lot.

Mr. Frey said that the Appellant "used to question us extensively about things of the Bible and different things of that nature" but that the "spiritual growth, it seemed to have stopped within him."

The Appellant testified that he was sorry for what he had done. Around the time the Appellant moved out of his father's house, Mr. Covington offered to let the Appellant stay with him. The Appellant was asked to leave Mr. Covington's residence because he did not help pay the bills. He said that he used all of the money he earned to support himself and his girlfriend's children. The Appellant said that he stopped smoking marijuana once, but he eventually started drinking heavily and using more drugs.

The Appellant said that on the day of the offenses, he drank a bottle of liquor and took some drugs at Mr. Covington's house. He, Mr. Covington, and Mr. Covington's girlfriend, Latrae Stevenson, left the house and rode around. Mr. Covington wanted to "bust some Mexicans," but no one was around. As they rode around, the Appellant fell asleep. When he woke, Mr. Covington told him they were at "the white boy house." The Appellant and Mr. Covington got out of the car and walked up the street. Mr. Covington said, "[L]et's go in this house right here." The Appellant saw a car outside and asked, "Are you sure there ain't nobody in the house?" Mr. Covington said that if someone was inside, he would "try to knock them out."

The Appellant said that Mr. Covington knocked on the front door for a couple of minutes then walked to the back door with the Appellant following him. They saw a window that was "cracked," and Mr. Covington pulled the window open and told the Appellant to enter first because he was smaller. Mr. Covington helped the Appellant then he came inside. The Appellant saw "a TV light" and told Mr. Covington that he thought someone was in the house. The Appellant said that Mr. Covington had a screwdriver in

his hand. Mr. Covington went through the house and assured the Appellant that no one was in the house. The Appellant started going through the house, and Mr. Covington "came running out of nowhere," saying that someone was at the door. They hid inside a room in the back of the house and saw A.S. enter the kitchen area and approach an "onion rack." The Appellant urged Mr. Covington to run out the back door, but Mr. Covington said, "I didn't come this far to go back empty handed." Mr. Covington and the Appellant ran out of the room, and A.S. turned when she heard footsteps. The Appellant said that after A.S. "was slammed onto the floor," he told Mr. Covington to check her pockets for a telephone or money. Mr. Covington complied but found nothing in A.S.'s pockets.

The Appellant said that Mr. Covington told him to take A.S. to the bedroom. The Appellant picked up A.S., carried her to the bedroom, and pushed her down on the bed. A.S. "was screaming, . . . begging and pleading." Mr. Covington hit her several times in the face and the back of the head to get her to be quiet. The Appellant grabbed a pillow and placed it over her head. She clawed at his arms, and he told her to get her hands off of him. Mr. Covington told A.S. to remove her rings. She complied and gave the rings to Mr. Covington. Mr. Covington left the room to find something to tie up A.S. but returned to the bedroom when his search was unsuccessful. Mr. Covington told the Appellant to get a cord from the radio in the kitchen. The Appellant said:

> [B]efore I went out – before I went out – before we exchanged on holding her down, I know Mr. Covington had grabbed her like – like she had some stretches or something on, he grabbed it and pulled it down – pulled it down. He was – he was sexually touching her, and I think that's when I left out to go get the cords.

When the Appellant returned to the bedroom, he heard Mr. Covington say, "[Y]ou haven't cheated on your husband with a black man. It was something crazy like that."

When the Appellant told Mr. Covington that he found only one cord, Mr. Covington told him to get a "charger cord" that was beside the bed. The Appellant tied up A.S. Afterward, A.S.'s "upper half was on the bed and her knees was touching the floor. Like she was bent over, and [Mr. Covington] was behind her." The Appellant asked Mr. Covington what he was doing, and Mr. Covington told him not to worry about it and to help him get her off of the bed. The Appellant told Mr. Covington to take A.S. into the bathroom. Meanwhile, the Appellant went through the closet.

The Appellant said that Mr. Covington left the house, got into the Jeep that was parked in the driveway, and returned with a purse. The Appellant told Mr. Covington that he had found a shotgun on the top shelf of a closet. Mr. Covington grabbed the

shotgun and went into the bathroom. The Appellant continued searching the bedroom. He walked out of the bedroom and noticed the "purse was, you know, scattered all over the floor." Mr. Covington came out of the bedroom with an Xbox game system inside a pillow case.

Mr. Covington told the Appellant to load everything into the Jeep and to sell the jewelry as soon as he could. The men left in the Jeep and drove to meet Ms. Stevenson. Mr. Covington got into Ms. Stevenson's car, and the Appellant followed in the Jeep. The Appellant went to an ATM but could not withdraw money because he had the wrong PIN. They then went to a Kwik Sak and attempted to use the card to purchase cigarettes.

The Appellant said that the apartment where the rifle was found belonged to Mr. Covington's cousin. The Appellant said that he planned to use the money from the robbery to pay his child support.

The Appellant said that since the offenses, his health had improved. He had gained weight, undergone counseling, attended drug and alcohol treatment programs, and participated in a faith-based behavior management program. Additionally, the Appellant had been baptized. The Appellant said that he wanted to help the State with Mr. Covington's case.

When asked what he should have done when Mr. Covington assaulted A.S., the Appellant responded, "I should have just walked away and just, you know, left it alone." He said that he felt "bad" for A.S. because "something happened like that to her." The Appellant said that while he stayed with Mr. Covington, Mr. Covington beat him and that he did anything Mr. Covington said because he feared being beaten again.

On cross-examination, the State asked the Appellant why he did not stop Mr. Covington from penetrating A.S. with the screwdriver. The Appellant replied that "it happened so fast, I really didn't see it go so quick. I had seen him pull her pants down and him playing on her . . . booty and stuff . . . ." He said that he "didn't think none of that was going to happen." The Appellant acknowledged that he could have left but said that he was afraid of what would happen to him.

The Appellant acknowledged telling Detective Hunter that Mr. Covington used the stolen card at the ATM. He admitted, however, that he was the one who used the card. The Appellant said that he lied because he was told that Mr. Covington intended to blame him for everything. The Appellant admitted that he helped Mr. Covington throw A.S. into the bathtub. He also heard Mr. Covington threaten to kill A.S. if she gave the wrong PIN.

The Appellant acknowledged that the State had not offered anything for his testimony. He said that he wanted to testify because he did not feel responsible for everything that happened to A.S. He stated that he owed Mr. Covington nothing and that Mr. Covington "tried to blame stuff on [him] that [he] didn't have – really didn't do." The Appellant said, "Mr. Covington, as you can see, is bigger than me, solid than me. He's more demanding and controlling than I am."

Upon questioning by the trial court, the Appellant said that he deserved a "second chance at life in society because [he had] been working to rehabilitate [him]self and to go by society rules and laws." Nevertheless, he acknowledged that he had been given second chances after his other convictions. The Appellant said that he helped the police by telling them that one of the stolen televisions was at the home of Mr. Covington's older brother. The police, however, were unable to recover the television.

The Appellant said that he put on the "King" gloves before entering the house. He said, "It really wasn't being – trying to get away with it. It was more of, you know, I was kind of scared that I didn't want to get in no trouble with the situation. Feared that if I didn't go through with it, that what are the chances of me going back to the neighborhood that they won't jump on me again or shoot me."

The trial court noted the inconsistencies between the Appellant's testimony and the victim's testimony. The trial court stated that the Appellant confessed to being under the influence of intoxicants at the time of the offenses and that the victim's memory, therefore, was more accurate than the Appellant's. Accordingly, the court found that the victim was more credible than the Appellant.

The trial court applied enhancement factor (1) based upon the Appellant's prior criminal convictions and his admission that he used drugs. Tenn. Code Ann. § 40-35-114(1). The trial court gave enhancement factor (1) "a lot of weight." The trial court applied enhancement factor (2), finding that the Appellant was "either a leader or co-leader in these crimes based on the evidence" and gave that enhancement factor "a lot of weight." Tenn. Code Ann. § 40-35-114(2). The trial court applied enhancement factor (3), that the offense involved more than one victim, noting that the Appellant had threatened the victim's children and that the children were potential victims. Additionally, the trial court applied enhancement factor (5), that the Appellant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense. The trial court also applied enhancement factor (9), that the Appellant possessed or employed a firearm or other deadly weapon during the commission of the offense, to the aggravated burglary, theft, and aggravated rape convictions. Tenn. Code Ann. § 40-35-114(9). The trial court noted that the firearm was not employed until after the rape but that the Appellant and Mr. Covington threatened to kill the victim with a screwdriver. The trial court applied enhancement factor (10), that the Appellant had no hesitation

about committing the crime when the risk to human life was high, to all convictions except aggravated robbery. Tenn. Code Ann. § 40-35-114(10). The trial court did not, however, give that enhancement factor much weight.

The trial court applied mitigating factor (10), that the Appellant assisted the authorities in locating or recovering property involved in the crime. Tenn. Code Ann. § 40-35-113(10). The trial court noted that the Appellant told the police the location of a stolen television. The court, however, afforded the mitigating factor little weight.

The trial court imposed mid-range sentences for each of the Appellant's convictions. Specifically, the trial court sentenced the Appellant as a Range I offender to four years for the aggravated burglary conviction, ten years for the aggravated robbery conviction, twenty years for the aggravated rape conviction, and three years for each theft conviction. The trial court ordered the Appellant's sentences to be served consecutively, for a total effective sentence of forty years.

On appeal, the Appellant challenges the length of the individual sentences and the imposition of consecutive sentencing.

## II.  Analysis

Initially, we note that the Appellant contends that our supreme court's conclusion in State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012), that the 2005 amendments abrogated the de novo standard of review was erroneous. The Appellant acknowledges that in 2005, in response to Blakely v. Washington, 542 U.S. 296 (2004), our legislature passed amendments to the Sentencing Act to ensure that Tennessee's sentencing scheme could withstand Sixth Amendment scrutiny. See State v. Carter, 254 S.W.3d 335, 342-43 (Tenn. 2008). Thereafter, our supreme court held that on appeal, the length, range, or manner of service of a sentence imposed by the trial court was to be reviewed under an abuse of discretion standard with a presumption of reasonableness. Bise, 380 S.W.3d at 708; see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). This court does not have the authority to overrule "our supreme court and their interpretations of the laws enacted by our legislature." David H. Plemons, Jr. v. State, No. M2007-00549-CCA-R3-PC, 2008 WL 5069193, at *6 (Tenn. Crim. App. at Nashville, Dec. 2, 2008). Accordingly, we will utilize the standard of review mandated by our supreme court for sentencing issues, which is the abuse of discretion standard.

In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4)

the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

Although the record does not contain a transcript of the guilty plea hearing, we have determined that the record is adequate for appellate review of the sentence. See Caudle, 388 S.W.3d at 279.

## A. Length of Sentences

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; Carter, 254 S.W.3d at 343. Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

On appeal, the Appellant does not challenge the trial court's application of enhancement factors (1), (2), (9), and (10) and mitigating factor (10). The Appellant does challenge the trial court's application of enhancement factors (3) and (5). Tenn. Code Ann. § 40-35-114(3), (5). When the trial court applied enhancement factor (3), that the offense involved more than one victim, the court stated that "normally, this would not apply because the victims were all set out in each specific indictment; however, one of the things that [A.S.] testified to that was noted by this Court already, but I want to reiterate it again, that [the Appellant] threatened to kill her kids. He said, we love to kill kids." Tenn. Code Ann. § 40-35-114(3). The trial court considered the victim's children to be potential victims. The State concedes that the trial court may have misapplied this enhancement factor and acknowledges that the victim's children do not meet the definition of "victim." We agree with the Appellant and the State that the trial court misapplied enhancement factor (3). Generally, "[a] victim is 'a person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime.'" State v. Cowan, 46 S.W.3d 227, 235 (Tenn. Crim. App. 2000) (quoting State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994)).

Regarding enhancement factor (5), which the trial court applied to the aggravated rape conviction, a trial court must find "cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). The "evidence must denote[ ] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." Id. (internal quotations and citation omitted). For example, this court has upheld the application of enhancement factor (5) based on evidence of extensive physical abuse or torture or when the record contains proof of psychological abuse or torture. Id. The court asserted that

> this situation here about the cruelty factor, most of the time the aggravated robbery and rape would factor into the cruelty factor. So this would not apply normally; however, the fact that she was tied up after the rape and her hair was pulled during this time frame and she was continually assaulted, physically being punished, and, of course, thrown like a basketball. Of course, the – just the threatening to kill her too, let's don't forget that, too, on the record[.]"

The proof adduced at the sentencing hearing also reveals that the victim's being raped with a screwdriver caused tearing in the victim's anus and that the perpetrators repeatedly threatened to kill her and her children before leaving her in the bathtub with her hands and feet bound. Given the foregoing, we conclude that the Appellant's claim that the victim was not treated with "'cruelty over and above that inherently attendant to the

crime'" is disingenuous. The trial court did not abuse its discretion by applying enhancement factor (5). See State v. Emmonie Dion Branch, Jr., No. M2013-01843-CCA-R3-CD, 2014 WL 5780807, at *6 (Tenn. Crim. App. at Nashville, Nov. 6, 2014).

As we stated, the trial court misapplied enhancement factor (3) but did not abuse its discretion by applying the remaining enhancement factors. Our supreme court has explained that a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed . . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Bise, 380 S.W.3d at 706. Moreover, "[m]ere disagreement with how the trial court weighed enhancing and mitigating factors is not an adequate basis for reversing a sentence." State v. Banks, 271 S.W.3d 90, 146 (Tenn. 2008) (citing Carter, 254 S.W.3d at 345-46). Accordingly, we conclude that the trial court did not err in determining the length of the Appellant's sentences.

B. Consecutive Sentencing

Finally, the Appellant argues that the trial court erred by ordering that the sentences be served consecutively. Generally, "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the following discretionary criteria for imposing consecutive sentencing:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation

- 15 -

about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7); see also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995).

Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). However, our case law reflects that in order to impose consecutive sentences based upon a finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting Wilkerson, 905 S.W.2d at 938); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In the instant case, the trial court found that the Appellant was a dangerous offender and that the Appellant was sentenced for an offense committed while on probation. Tenn. Code Ann. § 40-35-115(b)(4), (6).

First, we will address the trial court's imposition of consecutive sentencing based upon its finding that the Appellant was a dangerous offender. The Appellant contends that the trial court failed to state on the record the requisite findings that the sentences were necessary to protect the public from further misconduct by the Appellant and that the terms were reasonably related to the severity of the offenses. The Appellant further contends that the trial court failed to properly consider the purposes and principles of sentencing. However, the record belies these contentions.

The trial court said:

> The Court has tried to come up with the least severe measure necessary to protect the public from the [Appellant's] future criminal conduct. And, of course, the Court's already indicated that the Court does not believe the [Appellant's] potential for rehabilitation based on his previous convictions of not being able to comply with alternative sentences.
>
> And the Court just – again, going over the overall sentence in the case itself. This was a very egregious case and [A.S.] is lucky or blessed, I should say, to be alive. It's really a miracle. But the Court believes that [the Appellant] is a danger to the community based on his criminal history and the fact that he's had chances before and hasn't complied with them.

We conclude that the foregoing findings are sufficient to comply with the dictates of Wilkerson and that the trial court did not abuse its discretion by finding that the Appellant was a dangerous offender.

The trial court also imposed consecutive sentencing because the Appellant had been on probation for domestic violence for less than four months when he committed the instant offenses. The Appellant contends that although our Code "states briefly that a defendant may be given consecutive sentences for an offense or offenses committed while on probation, the Tennessee Legislature could not have intended for a defendant to be sentenced in such a drastically different manner merely because he/she was on a misdemeanor probation." We disagree. The Appellant does not cite any authority in support of this contention. Moreover, this court has repeatedly upheld the imposition of consecutive sentencing for an offense committed while on probation for a misdemeanor conviction. See State v. Jason Curtis Johnson, No. M2003-03060-CCA-R3-CD, 2006 WL 407767, at *19 (Tenn. Crim. App. at Nashville, Feb. 17, 2006); State v. Vidal L. Strickland, No. M2002-01714-CCA-R3-CD, 2003 WL 22243440, at *15 (Tenn. Crim. App. at Nashville, Sept. 30, 2003); State v. Parker Odell Doney, Jr., No. M2001-01187-CCA-R3-CD, 2002 WL 65994, at *9 (Tenn. Crim. App. at Nashville, Jan. 17, 2002). The imposition of consecutive sentencing was permissible on this basis alone.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE